UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ESTEBAN ENCARNACION,                    :

                    Plaintiff,          :      06 Civ. 6323 (HBP)

      -against-                         :      OPINION AND
                                               ORDER
                                        :

MICHAEL J. ASTRUE,
Commissioner of Social Security,        :

                    Defendant.          :

----------------------------------X

             PITMAN, United States Magistrate Judge:


I.   Introduction

             Plaintiff, Esteban Encarnacion, brings this action

pursuant to section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), seeking judicial review of a final decision of the

Commissioner of Social Security (the "Commissioner") denying his

application for disability insurance benefits.  The parties have

consented to my exercising plenary jurisdiction pursuant to 28

U.S.C. § 636(c).  Both plaintiff and the Commissioner have moved

for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  For the reasons set forth

below, the Commissioner's motion is granted and plaintiff's

motion is denied.

II.  Facts

    A.  Procedural Background

        Plaintiff filed an application for disability benefits, pursuant to 42 U.S.C. § 423(b), on May 15, 2003 (Tr.[1] 93-96). Plaintiff claimed in his application that he had been unable to work since April 12, 2003, because of chest pain and frequent dizziness (Tr. 106).  On July 28, 2003, the Social Security Administration denied plaintiff's application for benefits (Tr. 57-61).

        Plaintiff timely requested and was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 62-67).  The ALJ, Paul A. Heyman, conducted a hearing on January 31, 2006 at which both plaintiff and a medical expert testified (Tr. 34-56).[2]  In a decision issued on February 27, 2006, the ALJ found that plaintiff had the residual functional capacity ("RFC") to perform "sedentary work with no work in proximity to dangerous machinery or heights or involving driving a motor vehicle," and, therefore,

---

    [1]"Tr." refers to the certified transcript of the administrative record that the Commissioner filed as part of his answer in this case, as required by 42 U.S.C. § 405(g).

    [2]The ALJ initially scheduled the hearing for June 14, 2005, but the ALJ adjourned the hearing until August 18, 2005 to accommodate the schedules of plaintiff and his counsel (Tr. 24-25).  Plaintiff subsequently appeared with counsel on August 18, but the ALJ adjourned that hearing so that a medical expert could testify (Tr. 30).

was not disabled through the date of the ALJ's decision (Tr. 11, 19-20).  The ALJ's decision became the final decision of the Commissioner on June 3, 2006, when the Appeals Council denied plaintiff's request for review (Tr. 4-6).

Plaintiff commenced this action on August 21, 2006.  On February 5, 2007, the Commissioner moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Proce-dure (Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings, dated Feb. 5, 2007 ("Def.'s Br.")). Plaintiff opposed the Commissioner's motion, and cross-moved for judgment on the pleadings under Rule 12(c) on or about May 4, 2007 (Undated Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl.'s Br.")).  The Commissioner filed a memorandum in opposition to plaintiff's cross-motion and in further support of his motion on June 8, 2007 (Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings and in Further Support of Defendant's Motion for Judgment on the Pleadings, dated June 8, 2007 ("Def.'s Opp.")).

B.  <u>Relevant Evidence</u>

1.  Plaintiff's Age,
    <u>Education and Experience</u>

Plaintiff was born on May 1, 1959 in the Dominican Republic, completed the tenth grade of high school there, and

learned to read and write in Spanish and to read in English (Tr. 14, 36, 93, 111 (plaintiff stated on his disability benefits application that he had completed 10th grade in 1976), 331 (plaintiff's treating physician, Dr. Sujatha Baskar, noted that plaintiff had high school education).  But see Tr. 37 (plaintiff testified that he did not advance past first grade in elementary school and taught himself to read)).  From March 20, 1990 until April 12, 2003, he was self-employed as a taxicab driver (Tr. 37-38).  On the evening of April 12, 2003, he was admitted to Bronx-Lebanon Hospital Center ("Bronx-Lebanon") suffering from a myocardial infarction, commonly known as a heart attack (Tr. 125, 128).  As a result, plaintiff ceased driving altogether (Tr. 37, 42).  He has not worked again since that time (Tr. 107).

### 2.  Medical Evidence

#### a.  Treatment for Heart Attack

Dr. Oronde Smith and Dr. Latha Menon treated plaintiff in the Bronx-Lebanon Hospital emergency room on April 12 and 13, 2003.  Plaintiff told Dr. Smith that, beginning approximately one week prior to his visit, he had been experiencing intermittent episodes of pain and pressure in the center of his chest, which radiated out to his right arm (Tr. 125).  In addition, plaintiff

reported that he had diabetes mellitus,[3] high blood pressure and high blood cholesterol and that he smoked one pack of cigarettes per day (Tr. 125, 127).  Dr. Menon diagnosed plaintiff with unstable angina and a non-Q-wave myocardial infarction[4] and placed him on a number of medications (Tr. 127, 128).

On April 16, 2003, plaintiff was no longer experiencing chest pain, and he was transferred from Bronx-Lebanon to Monte-fiore Medical Center ("Montefiore") (Tr. 131, 141-42).  There, Dr. Adam Goldman performed a percutaneous coronary angioplasty[5] and inserted a stent in his artery (Tr. 139, 141-43, 219).  Plaintiff was discharged to his home the following day (Tr. 146).

---

[3]Diabetes mellitus is "a chronic syndrome of impaired carbohydrate, protein, and fat metabolism secondary to insufficient secretion of insulin or to target insulin resistance."  Dorland's Illustrated Medical Dictionary 460 (Elizabeth J. Taylor ed., 27th ed. 1988) ("Dorland's").

[4]A myocardial infarction is a "gross necrosis [morphological changes indicative of cell death] of the myocardium [the middle and thickest layer of the heart wall] as a result of interruption of the blood supply to the area . . . ."  Dorland's 834 (infarction), 1089 (myocardium), 1101 (necrosis).  "A 'non-Q-wave' infarction means that 'the scar or the damage therein does not penetrate the full thickness of the myocardial wall in the area where the infarct occurred.'"  Todman v. Astrue, 07 Civ. 10473 (JSR), 2009 WL 874222 at *7 (S.D.N.Y. Mar. 30, 2009).

[5]A percutaneous coronary angioplasty is a dilation of a coronary artery by means of a balloon catheter, which is inserted through the skin to the site of the narrowing and then inflated to flatten plaque against the arterial wall.  Dorland's 84.

b.   Treatment for Dizziness

On May 5, 2003, plaintiff returned to Bronx-Lebanon, complaining of dizziness and nausea (Tr. 186, 191, 207).  Dr. Chantal Simpson admitted plaintiff for inpatient treatment (Tr. 180).  Dr. Simpson noted that plaintiff was primarily diagnosed with syncope[6] and collapse, and secondarily diagnosed with uncontrolled Type II diabetes,[7] high blood pressure, high blood cholesterol, tobacco use disorder, and coronary artery disease (Tr. 180).  According to Dr. Simpson, plaintiff reported that he was experiencing chest pain in the form of pressure and tenderness in his upper left chest area (Tr. 188).  However, another attending physician subsequently noted that plaintiff was not experiencing chest pain and that his condition was stable (Tr. 185).

From May 6, 2003 until May 11, 2003, Dr. Shivaji Kadam treated plaintiff.  Dr. Kadam noted that plaintiff was apparently well after his angioplasty until May 3, 2003, when he experienced a sudden onset of dizziness that was accompanied by nausea but not vomiting, diarrhea or abdominal pain, and that plaintiff did not faint or lose consciousness and had no complaints of chest

[6]Syncope is a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or swoon.  Dorland's 1628.

[7]Type II diabetes is "usually characterized by a gradual onset with minimal or no symptoms of metabolic disturbance . . . and no requirement of exogenous insulin to prevent ketonuria and ketoacidosis; dietary control with or without oral hypoglycemics is usually effective."  Dorland's 460-61.

pain (Tr. 191).  In addition, Dr. Kadam noted that, according to plaintiff, the dizziness was not related to his posture and he had had previous episodes of similar dizziness beginning in 1993, when he was first diagnosed with diabetes (Tr. 191).  Dr. Kadam also noted that plaintiff was taking the following medications: Enalapril (to lower blood pressure), Atenolol (to lower blood pressure), Lipitor (to lower blood cholestorol), Plavix (to inhibit blood clots), Glipizide (to increase insulin release), and Acetosalicylic Acid (aspirin) (Tr. 192).  Dr. Kadam's impression was that plaintiff had uncontrolled diabetes, and that his fluctuating blood sugar should be monitored (Tr. 202, 214).  Dr. Kadam stated that plaintiff "does not take med[ication]s," but did not explain this statement (Tr. 214).

On May 8, 9 and 10, 2003, Dr. Kadam reported that plaintiff was no longer experiencing dizziness or chest pain (Tr. 218-20, 224, 227).  Plaintiff's glucose level ranged from 108 to 240 mg/dL, but he was asymptomatic.[8]  Dr. Kadam subsequently counseled plaintiff about the risks of continuing to smoke cigarettes and of the importance of stopping smoking (Tr. 221-22).  He discharged plaintiff on May 11, 2003, and instructed

---

[8]Glucose, or blood sugar, is measured in milligrams per deciliter.  The normal range is between 60 and 100 mg/dL. Oliveras ex rel. Gonzalez v. Astrue, 07 Civ. 2841 (RMB)(JCF), 2008 WL 2262618 at *1 n.3 (S.D.N.Y. May 30, 2008).

plaintiff to follow a diet restricted in sugar, fat and salt (Tr. 274).

### c.  Follow-up Treatment

Plaintiff returned for follow-up appointments at Bronx-Lebanon approximately every four to six weeks for the next two years.  Doctors Tricia Chan, Sujatha Baskar and Yogendra Prasad treated plaintiff during this period.[9]  Dr. Chan treated plaintiff only through November 2003, Dr. Prasad treated plaintiff through April 2004, and Dr. Baskar treated plaintiff through at least February 2005.  Dr. Baskar appears to have been plaintiff's primary treating physician (see Tr. 323 (Dr. Chan's notes refer to Dr. Baskar as plaintiff's primary medical doctor); Tr. 344, 356, 379 (Dr. Prasad stated on several occasions that he advised plaintiff to follow up with his primary medical doctor).  But see Tr. 321, 354 (Dr. Prasad stated that plaintiff would be seen by his primary medical doctor on September 10, 2003, and plaintiff was seen on that date by Dr. Chan).

At plaintiff's first follow-up appointment in May 2003, Dr. Baskar noted that plaintiff complained of occasional squeezing chest pain (Tr. 328).  However, plaintiff's physicians did not note that such complaints on any subsequent occasion.

_____

[9]Dr. Prasad's treating notes were usually also signed by either Dr. Ghassan Keriaky or Dr. Jonathan Bella.  However, for the sake of brevity, I shall refer only to Dr. Prasad.

Moreover, plaintiff's physicians specifically stated that plain-
tiff did not experience any further chest pain on numerous
follow-up visits (Tr. 184-85 (May 6, 2003), 221-22 (May 9, 2003),
354 (September 8, 2003), 378-79 (November 10, 2003), 316-17
(December 1, 2003), 361 (January 26, 2004), 343-44 (April 26,
2004)), and did not note any further heart attacks.[10]

      Plaintiff's diabetes remained uncontrolled throughout
2003 and 2004, even after he agreed to try taking insulin (Tr.
289, 294-95, 305-06, 308, 313, 314-15, 343-44, 354, 361, 378-79
(July 18, November 10, and December 12, 2003, as well as January
26, January 29, April 2, April 26, September 9 and October 8,
2004)).  In November 2003, Dr. Chan advised plaintiff to begin
taking insulin because, given his history of coronary artery
disease, he required strict blood-sugar control (Tr. 319).  Dr.
Prasad agreed (Tr. 379).  Plaintiff refused (Tr. 319).  Subse-
quently, in January 2004, plaintiff agreed to try insulin, after
Dr. Baskar advised him to do so (Tr. 313).  However, even after
plaintiff began to be prescribed insulin, Dr. Baskar repeatedly
expressed or implied that plaintiff was noncompliant with his
prescribed diet and medication regimens (see Tr. 294-95 (Septem-
ber 2004), 290 (October 2004), 283-84 (February 2005)).

-----

[10]In a questionnaire dated March 3, 2005, plaintiff reported
that he had suffered a second heart attack on September 24, 2003
(Tr. 285).  However, there is no additional evidence of this
event anywhere in the record.

In addition to his uncontrolled diabetes, plaintiff reported localized pain in certain extremities on several occasions in 2003 and 2004.  In August and September 2003, both Dr. Chan and Dr. Prasad noted that plaintiff reported experiencing pain in the median nerve distribution of his right (dominant) hand, arm and wrist for two to three months, which worsened at night (Tr. 321, 354, 355-56).  Dr. Chan noted that his symptoms were consistent with carpal tunnel syndrome and advised plaintiff to use a hand brace (Tr. 321).  On November 5, 2003, Dr. Chan noted that plaintiff reported that he had been experiencing lower extremity pain for the past six to seven months which would occur after he had walked for three blocks (Tr. 319).  Dr. Prasad noted in November 2003 that plaintiff could walk ten blocks (Tr. 378-79).  In January 2004, Dr. Prasad stated that plaintiff reported steady pain unrelated to exertion, but no chest pain, and that he could walk either five to six blocks without any increase in pain (Tr. 354).  Likewise, Dr. Baskar noted in January 2004 that plaintiff reported pain in both lower extremities but did not specify how far plaintiff could walk without pain (Tr. 313).

Plaintiff also reported dizziness and blurred vision on several occasions in 2003 and 2004.  On three occasions in 2003 and 2004, Drs. Baskar and Prasad noted that plaintiff reported experiencing dizziness when standing up (Tr. 303-04 (June 2004: plaintiff "c[omplained] o[f] dizziness"), 328 (May 2003:  plain-

tiff "c[omplained] o[f] dizziness . . . upon getting up"), 355-56
(August 2003:  plaintiff "occasionally fe[lt] dizziness on
standing [up]")).  Dr. Chan did not note whether plaintiff
experienced dizziness.  In January and March 2004, Dr. Baskar
also stated that plaintiff complained of blurred vision (Tr. 311-
12, 313).

### d.  RFC Assessments

#### i.  Dr. Chan

Dr. Chan completed a questionnaire concerning plain-
tiff's RFC on November 12, 2003, apparently at the request of the
Commissioner (Tr. 165-68).  Dr. Chan stated that plaintiff was
capable of lifting no more than ten pounds frequently, which the
questionnaire defined as "occurring one-third to two-thirds of an
8-hour workday (cumulative, not continuous)" due to his history
of coronary artery disease (Tr. 165).  Dr. Chan further noted
that plaintiff's abilities to sit, stand, walk, push, pull,
reach, handle, manipulate objects with his fingers, feel, see,
hear and speak were not affected by his impairment, and that
plaintiff could climb, balance, kneel, crouch, crawl and stoop
frequently (Tr. 166-67).  Although the questionnaire instructed
that it was "very important [for Dr. Chan] to describe the
factors that support[ed] [her] assessment [because the Commis-
sioner was] required to consider the extent to which [her]

assessment [was] supported" (Tr. 165), Dr. Chan did not give any further information concerning the medical findings supporting her assessments (Tr. 165-66).

ii.  Dr. Baskar

Dr. Baskar, who had been treating plaintiff every one to two months since May 16, 2003, also completed a questionnaire concerning plaintiff's RFC on January 29, 2004, apparently at plaintiff's request (Tr. 370-75).  Dr. Baskar diagnosed plaintiff with Type II diabetes mellitus,[11] coronary artery disease, high blood pressure and high blood cholesterol, and noted that his prognosis was fair (Tr. 370).  Dr. Baskar stated that plaintiff experienced the following symptoms associated with his diabetes: fatigue, general malaise, pain and numbness in his extremities, episodic blurriness in his vision, excessive thirst, rapid heart beat or chest pain, dizziness or loss of balance, hyperglycemic and hypoglycemic attacks and nausea (Tr. 370).  In addition, Dr. Baskar noted that plaintiff was experiencing dizziness, upset

---

[11]In March 2004, Dr. Baskar changed plaintiff's diagnosis to Type I diabetes (Tr. 283-84, 303-04, 308, 311-12).  Type I diabetes is "characterized by abrupt onset of symptoms, insulinopenia, dependence on exogenous insulin to sustain life, and a tendency to develop ketoacidosis.  In undiagnosed or inadequately controlled [Type I diabetes], lack of insulin causes hyperglycemia, protein wasting, and production of ketone bodies as a result of increased fat metabolism."  Dorland's 460.

stomach and headache as side effects of certain of his medica-
tions (Tr. 371).

Dr. Baskar further made the following observations
concerning plaintiff's work-related abilities:  Plaintiff's
dizziness, blurred vision and other uncontrolled-diabetes-related
symptoms rendered him incapable of even "low stress" jobs (Tr.
371).  These symptoms frequently interfered with his attention
and concentration (Tr. 371).  If plaintiff were placed in a
competitive work situation, he could sit for a total of between
four and six hours and stand for less than two hours in an eight-
hour workday, but he would need to be able to shift between
sitting, standing and walking at will (Tr. 372).  Plaintiff could
lift up to ten pounds frequently, and could lift 20 pounds rarely
(Tr. 373).  However, plaintiff could only walk for three blocks
without experiencing severe pain or requiring rest (Tr. 371,
373).  Plaintiff could sit for more than two continuous hours,
stand for twenty continuous minutes and occasionally climb stairs
(Tr. 372-73).  However, plaintiff could never climb ladders and
rarely twist, stoop or bend (Tr. 373).  Furthermore, plaintiff's
condition was likely to produce "'good days' and 'bad days'"
which would require him to be absent from work for more than four
days per month (Tr. 375).  Plaintiff also experienced chest pain
and bilateral leg pain which, in addition to his blurry vision,

would affect his ability to work at a regular job on a sustained
basis (Tr. 375).

### iii.  Consultative Physicians

#### (a)  Dr. Graham

Dr. Peter Graham, a specialist in internal medicine,
examined plaintiff at the Commissioner's request on July 18, 2003
(Tr. 149-52).  Dr. Graham noted that plaintiff had sustained a
myocardial infarction and underwent catheterization and angio-
plasty at Bronx-Lebanon Hospital, but had not experienced any
chest pains since then (Tr. 149).  Dr. Graham noted plaintiff's
history of diabetes mellitus, high blood pressure, high blood
cholesterol and smoking, but essentially did not note the pres-
ence of any functional limitations as a result of these condi-
tions.  Dr. Graham stated that plaintiff could sit, stand and
walk normally, retained a full range of motion and adequate
muscle strength (Tr. 151).  Although Dr. Graham noted that
plaintiff had described some vision problems, Dr. Graham stated
that there was no evidence of diabetic retinopathy[12] and that

---

[12]Diabetic retinopathy is an inflammation of the retina
associated with diabetes mellitus, "progressively characterized
by microaneurisms, intraretinal punctate hemorrhages, yellow,
waxy exudates, cotton-wool patches, and macular edema, or . . .
by neovascularization of the retina and optic disk . . . ."
Dorland's 1456.

plaintiff's vision was not grossly impaired (Tr. 150-51).  Dr. Graham did not discuss plaintiff's complaints of dizziness.

### (b)  Dr. Thomas

Dr. Thomas, who is not otherwise identified in the record, evaluated the medical evidence in plaintiff's file on July 28, 2003 (Tr. 153-63).  Dr. Thomas found, based on Dr. Graham's report and the fact that plaintiff was no longer experiencing chest pain, that plaintiff could occasionally lift up to 20 pounds and frequently lift up to ten pounds, that plaintiff could stand and/or walk for a total of about six hours and that plaintiff could sit for a total of about six hours out of an eight-hour workday (Tr. 154).  According to Dr. Thomas, plaintiff had no other limitations, except that he could rarely climb stairs due to his heart attack and history of heart disease (Tr. 156).  Dr. Thomas did not discuss plaintiff's complaints of dizziness and blurred vision.

### 3.  Administrative Hearing Testimony

#### a.  Plaintiff's Testimony

At the administrative hearing, plaintiff initially testified in Spanish with the assistance of an interpreter, but subsequently switched to English at the ALJ's request (Tr. 36-37).  Plaintiff testified in English to the following facts.

15

Plaintiff stopped working because of his heart attack (Tr. 39). He could no longer work as a taxicab driver after his heart attack because of his dizziness (Tr. 39). Although plaintiff used to work notwithstanding his dizziness, which he had been experiencing since 1994, when he was first diagnosed with diabetes, plaintiff would stop working when he felt too dizzy and tired to do so (Tr. 40).

Plaintiff also had difficulty walking at the time of the hearing because he had problems balancing (Tr. 42). He would "wobble" from one side of the sidewalk to the other side as if he were drunk, and he had difficulty changing sidewalks because "it's like [his] feet [would] get stuck together" (Tr. 42). Furthermore, when he rode the train, the train appeared to him to be moving even when it stopped (Tr. 39). One of plaintiff's doctors advised him to use a cane, but he had not yet purchased one at the time of the hearing (Tr. 42).

Plaintiff sometimes would walk for exercise from his house to Fordham Road, five minutes away, to play the lottery or go to the pharmacy. However, plaintiff would not go too far from home because he had to use the bathroom frequently (Tr. 42). In addition, plaintiff felt pain in both of his legs when he walked, though only during half of the day (Tr. 41). Plaintiff sometimes helped his wife with housework, when he was feeling up to it, though he sometimes would get disoriented (Tr. 44). Plaintiff

16

also experienced cramps and pain in his right arm, which some-
times would persist for an entire day (Tr. 44).  Plaintiff took
insulin three times a day for his diabetes as well as at least
six medications (Tr. 45).  One of his medications would make him
sleepy during the daytime after he took it (Tr. 45).  In addi-
tion, plaintiff sometimes experienced blurry vision and his eyes
got red and itched (Tr. 42).

Plaintiff did not testify in any greater detail con-
cerning the duration, frequency or severity of his dizziness, leg
and arm pain, blurred vision or sleepiness during the course of a
day, week or month.  Nor did plaintiff testify concerning how
this combination of alleged impairments affected his ability to
perform specific types of work tasks.

b.  The Medical Expert's Testimony

Dr. Harold Bernacke, a specialist in internal medicine
and cardiology also testified at the hearing.  He noted that
plaintiff had a history of high blood pressure, for which he was
taking medication, diabetes, for which he was taking insulin, and
elevated cholesterol.  Furthermore, Dr. Bernacke observed that
plaintiff had been smoking a pack of cigarettes per day for 20
years and that all of plaintiff's medical conditions -- espe-
cially his high blood pressure and smoking -- were risk factors
for coronary artery disease (Tr. 49).  Next, Dr. Bernacke inter-

17

preted plaintiff's treating physician's notes from Bronx-Lebanon
Hospital, dated May 6, 2003, to state that, following plaintiff's
heart attack, a portion of one of the left chambers of his heart
failed to contract as well as it should have, but that the rest
of his heart muscle was sufficient to enable his heart to pump a
normal amount of blood (Tr. 50-51).  Dr. Bernacke further ob-
served that plaintiff's cholesterol seemed to be under control
(Tr. 51).

Although plaintiff experienced dizziness, Dr. Bernacke
observed that the dizziness might be related to low blood pres-
sure, which, in turn, might be a side effect of the medications
plaintiff was taking (Tr. 52-53).  Dr. Bernacke stated that most
people tolerate such side effects, and that, in his opinion,
plaintiff would still be capable of performing sedentary work
(Tr. 52-53).  However, Dr. Bernacke cautioned that plaintiff was
taking medications that also had side effects of fatigue and
light-headedness and that his opinion concerning the cause of
plaintiff's dizziness was "conjectural" (Tr. 54).  Dr. Bernacke
also stated that a patient complaining of the degree of dizziness
that plaintiff allegedly experienced should have a neurological
evaluation in order to better understand the cause of it and
better treat it (Tr. 54).  However, Dr. Bernacke observed that
there was no neurological evaluation in plaintiff's medical
record (Tr. 54).

18

With respect to plaintiff's complaints of blurred vision, Dr. Bernacke stated that, hypothetically, if plaintiff's diabetes were poorly controlled and his blood sugar level were elevated, those two conditions alone could cause blurred vision without creating diabetic retinopathy (Tr. 54).  Thus, he noted, a patient in plaintiff's situation could potentially improve his condition by bringing his blood sugar level under control (Tr. 55).  However, Dr. Bernacke stated that such an improvement would only be "one possibility" in plaintiff's case (Tr. 54-55).  In addition, Dr. Bernacke noted that he could not state an opinion concerning whether plaintiff's blurred vision was actually being caused by his high glucose levels in light of the lack of detail in some of the record and the short amount of time in which Dr. Bernacke reviewed it (Tr. 55).

With respect to plaintiff's frequent need to urinate, Dr. Bernacke stated that that was a symptom of poorly controlled diabetes, but that it was also consistent with other disorders, such as prostate problems (Tr. 55).  With respect to plaintiff's experiencing cramps in his right hand, Dr. Bernacke noted that there were many different possible causes for that condition (Tr. 55).

III.  Analysis

    A.  Applicable Legal Principles

        1.  Standard of Review

        The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008);
Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v.
Chater, 221 F.3d 126, 131 (2d Cir. 2000); Tejada v. Apfel, 167
F.3d 770, 773 (2d Cir. 1999); Bubnis v. Apfel, 150 F.3d 177, 181
(2d Cir. 1998).  The term "substantial evidence" has been defined
as "'more than a mere scintilla.  It means such relevant evidence
as a reasonable mind might accept as adequate to support a
conclusion.'"  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996),
quoting Richardson v. Perales, 402 U.S. 389, 401 (1971); accord
Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); Burgess v.
Astrue, supra, 537 F.3d at 127-28; Halloran v. Barnhart, 362 F.3d
28, 31 (2d Cir. 2004); Veino v. Barnhart, supra, 312 F.3d at 586;
Tejada v. Apfel, supra, 167 F.3d at 773-74; Quinones ex rel.
Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997).

            The reviewing court does not conduct a de novo review
        as to whether the claimant is disabled, Parker v.
        Harris, 626 F.2d 225, 231 (2d Cir. 1980), nor may it
        substitute its own judgment for that of the Commis-
        sioner.  Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir.

> 1991); <u>Valente v. Sec'y of Health & Human Servs.</u>, 733
> F.2d 1037, 1041 (2d Cir. 1984).  When the Commis-
> sioner's decision is not supported by substantial
> evidence, a reviewing court must reverse the administra-
> tive decision because "the entire thrust of judicial
> review under the disability benefits law is to insure a
> just and rational result between the government and a
> claimant . . . ."  <u>Williams ex rel. Williams v. Bowen</u>,
> 859 F.2d 255, 258 (2d Cir. 1988).

<u>Lee v. Apfel</u>, CV 99-2930 (LDW), 2000 WL 356411 at *2 (E.D.N.Y.

Apr. 3, 2000); <u>see</u> <u>Veino v. Barnhart</u>, <u>supra</u>, 312 F.3d at 586

("Where the Commissioner's decision rests on adequate findings

supported by evidence having rational probative force, we will

not substitute our judgment for that of the Commissioner.").

Moreover, the Commissioner's decision must be affirmed if it is

supported by substantial evidence, even if there is substantial

evidence supporting plaintiff's position.  <u>Persico v. Barnhart</u>,

420 F. Supp.2d 62, 63 (E.D.N.Y. 2006), <u>citing</u> <u>Jones v. Sullivan</u>,

<u>supra</u>, 949 F.2d at 59-60.

     "Reversal and entry of judgment for the claimant is

appropriate only 'when the record provides persuasive proof of

disability and a remand for further evidentiary proceedings would

serve no purpose.'"  <u>Cruz ex rel. Vega v. Barnhart</u>, 04 Civ. 9794

(DLC), 2005 WL 2010152 at *8 (S.D.N.Y. Aug. 23, 2005), <u>modified</u>

<u>on other grounds</u>, 2006 WL 547681 (S.D.N.Y. Mar. 7, 2006), <u>quoting</u>

<u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980); <u>accord</u> <u>Rivera</u>

<u>v. Sullivan</u>, 923 F.2d 964, 970 (2d Cir. 1991); <u>Babcock v.</u>

<u>Barnhart</u>, 412 F. Supp.2d 274, 284 (W.D.N.Y. 2006); <u>Buonviaggio v.</u>

Barnhart, 04 Civ. 357 (JG), 2005 WL 3388606 at *5 (E.D.N.Y. Dec.
2, 2005); Rivera v. Barnhart, 379 F. Supp.2d 599, 604 (S.D.N.Y.
2005); see 42 U.S.C. § 405(g) ("The [district] court shall have
the power to enter, upon the pleadings and transcript of the
record, a judgment affirming, modifying, or reversing the deci-
sion of the Commissioner of Social Security, with or without
remanding the cause for a rehearing.").

2.   Determination of Disability

Under Title II of the Social Security Act, 42 U.S.C.
§§ 401 et seq., a claimant is entitled to disability benefits if
he or she can establish an "inability to engage in any substan-
tial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to last for a
continuous period of not less than 12 months."  42 U.S.C. §§
423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535
U.S. 212, 217-22 (2002) (both impairment and inability to work
must last twelve months).  The impairment must be demonstrated by
"medically acceptable clinical and laboratory techniques," 42
U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable
> to do his previous work but cannot, considering [the
> claimant's] age, education, and work experience, engage
> in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether
> such work exists in the immediate area in which [the
> claimant] lives, or whether a specific job vacancy

22

> exists for [the claimant], or whether [the claimant]
> would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  In addition, to
obtain disability benefits, the claimant's disability must have
commenced prior to the expiration of his or her insured status.
20 C.F.R. §§ 404.130, 404.315.

The Commissioner must consider both objective and
subjective factors when assessing a disability claim, including:
(1) objective medical facts and clinical findings; (2) diagnoses
and medical opinions of examining physicians; (3) subjective
evidence of pain and disability to which the claimant and family
or others testify; and (4) the claimant's educational background,
age and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d
Cir. 1999); Williams ex rel. Williams v. Bowen, supra, 859 F.2d
at 259; Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir. 1983).

"In evaluating disability claims, the [Commissioner] is
required to use a five-step sequence, promulgated in 20 C.F.R.
§§ 404.1520, 416.920."  Bush v. Shalala, 94 F.3d 40, 44 (2d Cir.
1996).

> First, the Commissioner considers whether the claimant
> is currently engaged in substantial gainful activity.
> Where . . . the claimant is not so engaged, the Commis-
> sioner next considers whether the claimant has a "se-
> vere impairment" that significantly limits his physical
> or mental ability to do basic work activities. . . .
> Where the claimant does suffer a severe impairment, the
> third inquiry is whether, based solely on medical
> evidence, he has an impairment listed in Appendix 1 of
> the regulations or equal to an impairment listed there.
> . . . If a claimant has a listed impairment, the Com-

23

> missioner considers him disabled.  Where a claimant
> does not have a listed impairment, the fourth inquiry
> is whether, despite his severe impairment, the claimant
> has the residual functional capacity to perform his
> past work. . . . Finally, where the claimant is unable
> to perform his past work, the Commissioner then deter-
> mines whether there is other work which the claimant
> could perform.

Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); see also

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Butts v. Barnhart,

388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416

F.3d 101 (2d Cir. 2005); Green-Younger v. Barnhart, 335 F.3d 99,

106 (2d Cir. 2003); Curry v. Apfel, 209 F.3d 117, 122 (2d Cir.

2000); Shaw v. Chater, supra, 221 F.3d at 132; Brown v. Apfel,

supra, 174 F.3d at 62; Tejada v. Apfel, supra, 167 F.3d at 774;

Rivera v. Schweiker, supra, 717 F.2d at 722.

Step four requires that the ALJ make a determination as

to the claimant's RFC.  See Sobolewski v. Apfel, 985 F. Supp.

300, 309 (E.D.N.Y. 1997).  RFC is defined in the applicable

regulations as "the most [the claimant] can still do despite

[his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

To determine RFC, the ALJ makes a "function by function assess-

ment of the claimant's ability to sit, stand, walk, lift, carry,

push, pull, reach, handle, stoop, or crouch."  Sobolewski v.

Apfel, supra, 985 F. Supp. at 309.  The results of this assess-

ment determine the claimant's ability to perform the exertional

24

demands of sustained work, and may be categorized as sedentary,[13]
light, medium, heavy or very heavy.  20 C.F.R. §§ 404.967,
416.967; see Rodriguez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL
150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998).

The claimant bears the initial burden of proving
disability with respect to the first four steps.  Burgess v.
Astrue, supra, 537 F.3d at 128; Green-Younger v. Barnhart, supra,
335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80.  Once
the claimant has satisfied this burden, the burden shifts to the
Commissioner to prove the final step -- that the claimant's RFC
allows the claimant to perform some work other than the claim-
ant's past work.  Balsamo v. Chater, supra, 142 F.3d at 80; Bapp
v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

> In meeting [his] burden of proof on the fifth step
> of the sequential evaluation process described above,
> the Commissioner, under appropriate circumstances, may
> rely on the medical-vocational guidelines contained in
> 20 C.F.R. Part 404, Subpart P, App. 2, commonly re-
> ferred to as "the Grid."  The Grid takes into account
> the claimant's RFC in conjunction with the claimant's
> age, education and work experience.  Based on these
> factors, the Grid indicates whether the claimant can

---

[13]Sedentary work generally involves up to two hours of
standing or walking and six hours of sitting in an eight-hour
workday.  Social Security Ruling 96-9p, Titles II and XVI:
Determining Capability to Do Other Work -- Implications of a
Residual Functional Capacity for Less than a Full Range of
Sedentary Work ("Ruling 96-9p"), 1996 WL 374185 at *3 (1996).
Sedentary work also involves "lifting no more than ten pounds at
a time and occasionally lifting or carrying articles like docket
files, ledgers and small tools."  20 C.F.R. §§ 404.1567(a),
416.967(a).

>       engage in any other substantial gainful work which
>       exists in the national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl,

J.).  When a claimant retains the RFC to perform at least one of

the categories of work listed on the Grid, and when the claim-

ant's educational background and other characteristics are also

captured by the Grid, the ALJ may rely exclusively on the Grid in

order to determine whether the claimant retains the RFC to

perform some work other than his or her past work.  Butts v.

Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) ("In the ordinary

case, the Commissioner meets his burden at the fifth step by

resorting to the [Grid].").

        However, "exclusive reliance on the [Grid] is inappro-

priate" where non-exertional limitations "significantly diminish

[a claimant's] ability to work."  Butts v. Barnhart, supra, 388

F.3d at 383, quoting Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir.

1999) (internal quotation omitted); Bapp v. Bowen, supra, 802

F.2d at 603.  When a claimant suffers from a non-exertional

limitation such that she is "unable to perform the full range of

employment indicated by the [Grid]," Bapp v. Bowen, supra, 802

F.2d at 603, or the Grid fails "to describe the full extent of

[the] claimant's physical limitations," Butts v. Barnhart, supra,

388 F.3d at 383, the Commissioner must introduce the testimony of

a vocational expert in order to prove "that jobs exist in the

economy which the claimant can obtain and perform."  Butts v.

Barnhart, supra, 388 F.3d at 383; see 20 C.F.R. § 1569a(d), pt. 404, subpt. P, app. 2, § 200.00(e); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

    B.  The ALJ's Decision

        In his decision, the ALJ did not summarize any of the testimony at the hearing, although he did summarize the relevant medical evidence.  The ALJ alluded to plaintiff's testimony by stating that "[t]he claimant appeared and testified with the assistance of a Spanish interpreter at a hearing held on January 31, 2006 in Bronx, NY" and by stating that he "f[ound] the claimant's allegations regarding his limitations [to be] not totally credible for the reasons set forth in the body of the decision" (Tr. 19).  The "body of the decision" described many of plaintiff's allegations which were reflected in his treating physicians' notes, but it did not explicitly discuss plaintiff's testimony.  The ALJ also mentioned that Dr. Bernacke testified at the hearing, but did not discuss the substance of Dr. Bernacke's testimony except to note that the testimony supported Dr. Chan's RFC assessment (Tr. 14, 17).

The ALJ rejected Dr. Baskar's findings concerning plaintiff's limited ability to function in a work environment and adopted Dr. Chan's findings that plaintiff could perform the essential functions of sedentary work.  The ALJ explained his reasoning as follows:

> The record indicates that Dr. Baskar was more involved with the claimant's care and treated him fairly intensively, at least through the end of 2003.  However, Dr. Chan's opinion is supported by the testimony of the medical expert [Dr. Bernacke] and consultative physician Dr. Graham, who is also a board certified internist.
>
> The undersigned finds that Dr. Baskar's opinion is, in some respects, inconsistent with the treating notes and the testimony of the claimant.  For instance, Dr. Baskar indicated that the claimant is only capable of walking three blocks.  The treating notes on some occasions indicate that he can walk 5-6 blocks or as much as 10 blocks.  While the claimant's diabetes mellitus has been characterized as unstable, there are no findings to support a definitive diagnosis of diabetic neuropathy,[14] nephropathy,[15] or retinopathy.  The treating notes generally report no or only occasional chest pain and occasional dizziness.  He was not found to suffer from fainting or syncope.  A health assessment from February, 2005 noted that [plaintiff] continues to smoke 1 1/2 packs of cigarettes a day, but exercises regularly.  The undersigned finds that Dr. Baskar's opinion is not sufficiently supported by the record so as to assign it controlling weight, in view of the contrary opinions of three other board certified physicians, one of whom is also a treating source.

---

[14]Neuropathy is "a general term denoting functional disturbances and/or pathological changes in the peripheral nervous system."  Diabetic neuropathy is "a chronic, symmetrical sensory polyneuropathy affecting first the nerves of the lower limbs . . . ."  Dorland's 1131.

[15]Nephropathy is "disease of the kidneys."  Dorland's 1107.

28

(Tr. 17-18).

At the first and second steps of the five-step se-
quence, the ALJ found that plaintiff was not engaged in substan-
tial gainful activity and had a severe impairment, but retained
the RFC to perform "substantially all of the full range of
sedentary work," which consisted of "the ability to lift and
carry ten pounds, sit for six hours, and stand and walk for two
hours in an eight-hour workday" (Tr. 16, 20).  The ALJ qualified
these findings by noting that plaintiff was unable to work in
proximity to dangerous machinery, to work at heights, or to drive
a motor vehicle, but did not explain these findings (Tr. 16).  At
the third step, the ALJ found that plaintiff's impairments were
not listed in Appendix 1 of the regulations, nor were they
medically equal to any of the impairments listed there (Tr. 19).
At the fourth step, the ALJ determined that plaintiff was not
able to perform his past relevant work.  At the fifth step, the
ALJ found that plaintiff was a younger individual aged 45 to 49
with a limited education and no transferable skills from any past
relevant work (Tr. 18, 19).  Nevertheless, on the basis of
plaintiff's RFC, age, education and past relevant work experi-
ence, as well as Rule 201.18 of the Grid, the ALJ concluded that
plaintiff was not disabled through the date of his decision (Tr.
23).

C.  <u>Plaintiff's Arguments</u>

Plaintiff claims that the ALJ's decision should be reversed, but his brief, which was prepared by counsel, is so poorly drafted that it is difficult to identify the arguments he is making in support of that conclusion.  Plaintiff makes the following statements that might be intended to constitute legal arguments:  (1) plaintiff "has only a[] [first] grade education . . . [which] makes rehabilitation highly unlikely because [plaintiff has] . . . no transferable skills from [his] past relevant work . . ." (Pl.'s Br. 3); (2) the ALJ "clearly dis-regard[ed] [plaintiff's] subjective" allegations concerning his chest pain, dizziness, blurred vision, head pain, pain and cramping in his right hand, foot pain, wobbliness while walking, frequent urination and sleepiness and his complaints concerning those conditions "[were] not . . . taken seriously by the ALJ" (Pl.'s Br. 4, 7); (3) the ALJ "must provide an explanation of why he has disregarded probative evidence or why certain evidence was credited and conflicting evidence rejected" (Pl.'s Br. 7); (4) Social Security Ruling 3-13 requires ALJs to address "the extent to which the exertional scope of work is reduced by the side effects of [a claimant's] non-exertional impairments[] and . . . whether a claimant can be expected to make a vocational adjust-ment . . ." (Pl.'s Br. 6); and (5) "if the vocational expert [<u>sic</u>] [was] not sure [of whether plaintiff had a "residual

problem"], why is he recommending that [plaintiff] . . . could

perform sedentary work?" (Pl.'s Br. 4-5).[16]  With respect to what

_____

[16]Plaintiff also makes four arguments that are either
contrary to the facts in this case or have no bearing on the
facts of his case.

First, he argues that the ALJ could not properly rely on the
testimony of the "vocational expert" in order to support a
finding that the claimant could perform jobs in the national
economy and that the hypotheticals posed to the vocational expert
were improper (Pl.'s Br. 4).  However, no vocational expert
testified, and the ALJ relied exclusively on the Grid in order to
determine whether plaintiff could perform jobs in the national
economy.

Second, Plaintiff discusses the legal standard for
determining whether a claimant's impairment is severe, and notes
that the ALJ "must consider the combined effect of all of [a]
claimant's impairments on his ability touchtone [sic] without
regard to whether each alone was sufficiently severe" (Pl.'s Br.
5-6).  However, there is no dispute that the ALJ correctly found
that plaintiff's impairments were severe within the meaning of
the Social Security regulations (Tr. 15).

Third, plaintiff argues that, in the Fourth Circuit,
subjective complaints of pain and physical discomfort can give
rise to a finding of total disability (Pl.'s Br. 7).  However,
the fact that pain may give rise to disability does not mean that
plaintiff's pain was disabling in this case.  Plaintiff does
identify any evidence showing that his pain and physical
discomfort were so severe as to be totally disabling, nor have I
found such evidence in the record.

Fourth, plaintiff argues that the ALJ "must state reasons
for . . . adopting a given hypothetical question and answer"
[sic] (Pl.'s Br. 5).  However, plaintiff does not specify what
"hypothetical question and answer" the ALJ adopted, nor is such a
hypothetical question and answer evident in the record.  The ALJ
did not pose any hypotheticals to Dr. Bernacke, and did not adopt
Dr. Bernacke's testimony in his decision; the ALJ simply stated
that Dr. Bernacke's testimony supported Dr. Chan's RFC
determination.

Thus, all of these arguments are inapplicable to plaintiff's
(continued...)

I understand to be plaintiff's first and second arguments, the
Commissioner responds that the ALJ properly considered plain-
tiff's education level and plaintiff's subjective allegations
(Def.'s Opp. 2-3).  The Commissioner does not address what I
understand to be plaintiff's other arguments.

       1.   The ALJ's Finding
           that Plaintiff Had
           <u>a Limited Education</u>

      Plaintiff first argues that his first grade education
makes "rehabilitation highly unlikely because [of his] very
limited work experience" (Pl.'s Br. 3).  I interpret this to mean
that plaintiff argues that the ALJ's finding that plaintiff had a
limited education was not supported by substantial evidence and
that, as a result, the ALJ did not correctly apply the Grid in
finding that there were jobs in the national economy that plain-
tiff could perform.  The Commissioner disagrees.

      The ALJ found that plaintiff had a "limited education"
(Tr. 20).  The Social Security regulations define a limited
education as "ability in reasoning, arithmetic, and language
skills, but not enough to do most of the more complex job duties
needed in semi-skilled or skilled jobs."  20 C.F.R.
§§ 404.1564(b)(3), 416.964(b)(3).  The regulations further

---

     [16](...continued)
case.

provide that, in general, "a 7th grade through the 11th grade
level of formal education is a limited education."  20 C.F.R.
§§ 404.1564(b)(3), 416.964(b)(3).  Rule 201.18 of the Grid
provides that an individual between the ages of 45 and 49 with a
maximum capability of sedentary work, unskilled work experience
or no work experience, and a limited education or less who is "at
least literate and able to communicate in English" is not dis-
abled.  20 C.F.R. Pt. 404, subpt. P, app. 2, Rule 201.18.

  Here, plaintiff told his treating physician and noted
on his disability benefits application, under penalty of perjury,
that he had completed the tenth grade of high school (Tr. 111,
113, 331).  Although plaintiff testified at the hearing that he
only completed the first grade (Tr. 37), plaintiff conceded in
his brief to this Court that he intended this to mean that he had
completed his first year of high school (Pl.'s Br. 3).  In
addition, plaintiff admitted that he could read English, and he
was able to communicate orally in English during most of the
hearing.  Based on the ALJ's finding that plaintiff had a tenth
grade education, plaintiff's admissions that he had completed the
first year of high school and could read English, as well as his
ability to testify in English at the hearing, substantial evi-
dence supported a determination that plaintiff was literate and
able to communicate in English and, thus, met the minimum re-

quirements of a "limited education."  Accordingly, the ALJ
correctly applied that aspect of the Grid.

### 2.  Plaintiff's Subjective Complaints

Plaintiff next argues that the ALJ "clearly dis-
regard[ed]" or did not "take[] seriously" plaintiff's subjective
allegations concerning his chest pain, dizziness, blurred vision,
head and foot pain, pain and cramping in his right hand,
wobbliness while walking, frequent urination and sleepiness
(Pl.'s Br. 4, 7).  The Commissioner disagrees.

Plaintiff does not argue that the ALJ failed to develop
the record concerning plaintiff's subjective complaints.  Nor
does he argue that the ALJ failed to follow the proper procedure
for assessing such evidence.  Instead, plaintiff argues that the
ALJ "disregarded" and did not "take seriously" plaintiff's
subjective complaints.

Plaintiff provides no explanation of how the ALJ's
decisionmaking process was legally deficient, and it is not
appropriate for me to create that argument for plaintiff sua
sponte.[17]  See Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 811
(10th Cir. 2004) ("[T]he court will not construct arguments or
theories for the plaintiff in the absence of any discussion of

---

[17]Because plaintiff is represented by counsel, the lenient
rules of interpretation afforded to pro se submissions are not
appropriately applied in this case.

those issues."); <u>Daugherty v. Barnhart</u>, 1:00-CV-399, 2003 WL
1831063 at *4 (E.D. Tex. Feb. 4, 2003) ("Plaintiff cites no
statute, regulation or court decision which can support this
assertion, nor does plaintiff further explain this point through
legal argument . . . .  Thus, plaintiff presents nothing meaning-
ful to review, and leaves the court in the position of essen-
tially having to guess and construct an argument in plaintiff's
behalf.").

        Further, it is by no means clear that the ALJ disre-
garded plaintiff's subjective allegations or failed to take them
seriously.  The ALJ explicitly discussed the fact that plaintiff
had complained to his doctors of chest pain, dizziness, blurred
vision, pain in his head, feet, right hand, wrist, elbow and arm,
numbness in his extremities, difficulty walking, frequent urina-
tion and fatigue (Tr. 16-17).  The ALJ discussed every type of
complaint that plaintiff cites, which suggests that the ALJ did
consider those complaints and took them seriously.[18]  Because
plaintiff does not offer any other arguments for why the ALJ's
discussion of his subjective complaints was legally deficient,
plaintiff's allegations concerning the ALJ's disregard for his
complaints does not present grounds for reversal.

---

        [18]Although the ALJ did not discuss plaintiff's right hand
cramping <u>per se</u>, the ALJ did note that plaintiff's physician
found his symptoms to be consistent with carpal tunnel syndrome
and recommended that he use a brace (Tr. 16).

        3.   The ALJ's Explanations
             for His Evidentiary Findings

        Plaintiff next argues that the ALJ "must provide an
explanation of why he has disregarded probative evidence or why
certain evidence was credited and conflicting evidence rejected"
(Pl.'s Br. 7), citing Cotter v. Harris, 642 F.2d 700 (3rd Cir.
1981).  The Commissioner does not respond.

        In Cotter, the claimant, a welder of heavy equipment,
was hospitalized due to a pattern of premature heart contrac-
tions.  642 F.2d at 702-03.  The physician who treated Cotter at
the conclusion of his hospital stay, and who had been treating
him for approximately three years, diagnosed him with a number of
heart conditions, including arteriosclerotic heart disease, and
stated that he did not think that the claimant should return to
his usual work.  642 F.2d at 703.  A specialist in cardiovascular
disease who treated Cotter three months later concurred.  642
F.2d at 703.  However, the ALJ discussed only the opinion of a
consulting physician who found that Cotter was capable of lifting
heavy objects frequently notwithstanding the occasional premature
heart contraction.  642 F.2d at 704.  The ALJ did not even
mention, let alone give a reason for rejecting, the "the obvi-
ously probative and significant" findings and conclusions of
Cotter's treating physicians that conflicted with the conclusions
of the consulting physician.  642 F.2d at 704.

                               36

The Second Circuit, like the Third Circuit, has recognized that an ALJ must explain the reasons for rejecting treating physicians' opinions. E.g., Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (The ALJ must "comprehensively set forth [his] reasons for the weight assigned" to all treating physicians' opinions."); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("Under the applicable regulations, the [Commissioner] is required to explain the weight it gives to the opinions of a treating physician."); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("[The Commissioner] will always give good reasons in [his] notice of determination or decision for the weight [he] give[s] [the claimant's] treating source's opinion.").

Here, unlike in Cotter, the ALJ discussed the conflicting RFC findings of Drs. Chan and Baskar in some detail (Tr. 17-18). The ALJ explained that, even though Dr. Baskar was "more involved with [plaintiff's] care and treated him fairly intensively," there were several findings in Dr. Baskar's opinion that were inconsistent with other evidence in the record which the ALJ identified (Tr. 17-18). Thus, the ALJ did not fail to explain the reasons for rejecting plaintiff's treating physicians' opinions as was the case in Cotter. Plaintiff does not challenge any specific aspect of the ALJ's explanation as unsupported. Nor does plaintiff identify any other evidence in the record that the ALJ improperly "disregarded" or "rejected." Accordingly, plain-

tiff's statement that an ALJ "must provide an explanation of why he has disregarded probative evidence or why certain evidence was credited and conflicting evidence rejected" does not furnish him a basis for relief.

### 4.   The ALJ's Consideration of Non-exertional Impairments

Plaintiff's fourth argument is that the Social Security regulations require the ALJ to address "the extent to which the exertional scope of work is reduced by the side effects of [a claimant's] non-exertional impairments[] and . . . whether a claimant can be expected to make a vocational adjustment . . ." (Pl.'s Br. 6).[19]   The Commissioner does not respond.

---

[19]Plaintiff cites to "Social Security Ruling 3-13" as the sole authority for his argument.  Plaintiff appears to be referring to Social Security Ruling 83-13, which was superseded by Social Security Ruling 85-15 over 20 years ago, and is not available on Westlaw or on the Social Security Administration website.  Social Security Ruling 85-15, Titles II and XVI: Capability to Do Other Work -- The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments ("Ruling 85-15"), 1985 WL 56857 at *1 (1985); Social Security Ruling 83-13, 1983 WL 31261 at *1 (1983) ("This ruling has been . . . superseded . . . .").

Ruling 85-15 states that, where a claimant has only non-exertional limitations, the ALJ cannot rely on the Grid in order to assess whether there are jobs in the national economy which the he or she can perform.  Ruling 85-15, 1985 WL 56857 at *3.  Instead, the ALJ must make an individualized determination of (1) "how much the [claimant's] occupational base . . . is reduced by the effects of [his or her] nonexertional impairment(s)" and (2) "whether the [claimant] can be expected to make a vocational adjustment considering . . . his or her age, education, and work experience."  Ruling 85-15, 1985 WL 56857 at *3.  However, Ruling
(continued...)

Where a claimant has exertional impairments as well as non-exertional impairments, the regulations instruct the ALJ to determine whether and to what extent the claimant's non-exertional limitations diminish the range of jobs that the claimant could perform, using the Grid as a framework.  20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)(2).  However, where a claimant has only exertional impairments, the ALJ may rely exclusively on the Grid to determine whether jobs exist in the national economy for someone with the claimant's capabilities. Rosa v. Callahan, supra, 168 F.3d at 82; Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996).

Here, the ALJ was justified in relying exclusively on the Grid because he adopted Dr. Chan's assessment that plaintiff had no non-exertional limitations.  Dr. Chan stated that plain-tiff was capable of climbing and balancing frequently and had no limitations on his ability to sit, stand, walk, push, pull, reach or his ability to handle and manipulate objects (Tr. 166-67). Although Dr. Baskar disagreed with Dr. Chan and stated that plaintiff suffered from a number of non-exertional limitations, the ALJ explained his reasoning for crediting Dr. Chan over Dr.

---

[19](...continued)
85-15 is not applicable to claimants with both exertional and non-exertional impairments such as plaintiff.  Thus, plaintiff's citation to Ruling 83-13 is both outdated and substantively incorrect.  However, because part of plaintiff's statement of the law is correct, I shall discuss the merits of plaintiff's argument to the extent that it is applicable.

Baskar, and plaintiff does not challenge that reasoning (Tr. 17).
Nor does plaintiff argue that Dr. Chan's RFC assessment was
unsupported by medical evidence and does not, therefore, consti-
tute substantial evidence.  In light of Dr. Chan's unchallenged
finding that plaintiff had none of the non-exertional limitations
that he now claims to have, the ALJ committed no error by failing
to determine the extent to which plaintiff's non-exertional
limitations diminished the range of jobs that he could perform.

### 5.   The Alleged Inconsistency in Dr. Bernacke's Testimony

Finally, plaintiff appears to argue that there was an
inconsistency in Dr. Bernacke's testimony (Tr. 4-5 ("Even though
the Vocational Expert [sic] testified that claimant could do
sedentary work if he wanted . . . he [also] testified that
claimant may have some residual problem but he was not
sure . . . [.]  [I]f the Vocational Expert is not sure, why is he
recommending that the claimant . . . could perform sedentary
work?")).  However, plaintiff does not explain how this inconsis-
tency justifies the conclusion that the ALJ's decision was not
supported by substantial evidence.

The ALJ did not rely exclusively or even primarily on
Dr. Bernacke's testimony in assessing plaintiff's RFC.  Further-
more, even if the ALJ had relied on Dr. Bernacke's testimony,
there was no actual inconsistency in Dr. Bernacke's testimony

that would undermine his conclusion that plaintiff could perform sedentary work.  Dr. Bernacke stated that a patient complaining of the degree of dizziness that plaintiff allegedly experienced should have a neurological evaluation in order to better understand the cause of it and better treat it (Tr. 54).  However, Dr. Bernacke did not imply that the absence of a neurological evaluation made him uncertain of the accuracy of his professional opinion as to plaintiff's functional capabilities.  Thus, although Dr. Bernacke may have felt that a neurological evaluation might be helpful to plaintiff's treating physician, that did not undermine Dr. Bernacke's conclusion, based on the evidence available to him at the time of the hearing, that plaintiff was capable of performing sedentary work.

IV.  <u>Conclusion</u>

Accordingly, for all the foregoing reasons, I conclude that plaintiff has failed to demonstrate that the Commissioner's decision is not supported by substantial evidence.  The Commissioner's motion for judgment on the pleadings is, therefore,

granted and plaintiff's motion is denied.

Dated:   New York, New York
         September 1, 2009

                              SO ORDERED

                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Jane I. Farley, Esq.
Box 201
126-14C Merrick Boulevard
Jamaica, New York  11434

Susan D. Baird, Esq.
Assistant United States Attorney
3rd Floor
86 Chambers Street
New York, New York  10007